UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____

PENELOPE BERTOLOTTI,

             Plaintiff,        Civil No. 14-2315 (NLH/KMW)

v.

                               **OPINION**

AUTOZONE, INC., et al.,

             Defendants.

_____

**APPEARANCES:**

Drake P. Bearden, Jr., Esquire
Kevin M. Costello, Esquire
Costello & Mains
18000 Horizon Way
Suite 800
Mt. Laurel, New Jersey 08054

      *Attorneys for Plaintiff*

Matthew Adam Green, Esquire
Obermayer Rebmann Maxwell & Hippell, LLP
200 Lake Drive East
Suite 110
Cherry Hill, New Jersey 08002

      *Attorneys for Defendants*

**HILLMAN, District Judge:**

In this employment action, Plaintiff Penelope Bertolotti

alleges that she was discriminated against by her employer,

AutoZoners, LLC (hereafter, "AutoZone")[1] and her supervisor,

Richard Thomson, because of her disability.  Presently before

_____

[1] The complaint names AutoZone, Inc. as a defendant, but the
Notice of Removal clarifies that the proper name of this
defendant is AutoZoners, LLC.

1

the Court is a motion [Doc. No. 21] for summary judgment filed by Defendants AutoZone and Thomson, which is opposed by Plaintiff.  The Court has considered the submissions of the parties and decides this matter pursuant to Fed. R. Civ. P. 78.

For the reasons that follow, Defendants' motion for summary judgment is denied.

I.   **JURISDICTION**

As Plaintiff's claims are based solely on state law, the Court exercises subject matter jurisdiction over this diversity action pursuant to 28 U.S.C. § 1332.  Plaintiff is a citizen of the State of New Jersey, Defendant AutoZone is a limited liability company, the sole member of which is AutoZone Stores, Inc., a Nevada corporation with its principal place of business in Tennessee, and Defendant Thomson is a citizen of the State of Tennessee.  The amount in controversy is alleged to exceed $75,000.

II.  **BACKGROUND**

Plaintiff was hired by AutoZone on January 21, 2012 as a Divisional Human Resources Generalist.  (Defendants' Statement of Undisputed Material Facts (hereafter, "Defs.' SOF") ¶ 3.)  Plaintiff's direct supervisor was Defendant Thomson, the Divisional Human Resources Manager.  (Id. ¶ 4.)  On February 21, 2012, Plaintiff applied for the position of Regional Human Resources Manager in the Philadelphia region.  (Id. ¶ 5.)

2

Plaintiff was hired for the position, which was considered a promotion and which included a pay raise.  (Id. ¶ 9.)  Once Plaintiff was promoted, her direct supervisor was Regional Manager Bill Smith.  (Id. ¶ 13.)  Plaintiff at that time had a "dotted line supervisory relationship" to Defendant Thomson. (Id.)  Thereafter, Plaintiff's supervisor became Shawn Sheikhzadeh.  (Id. ¶ 15.)

Plaintiff suffers from a medical condition called gastroparesis, which she was first diagnosed with in 2008.  (Id. ¶ 32.)  According to Plaintiff, gastroparesis is an incurable disease that affects Plaintiff's ability to digest food and liquids.  (Pl.'s Counterstatement of Material Facts (hereafter, "Pl.'s SOF") ¶ 1.)  As a result of her condition, Plaintiff wears a pacemaker that assists her stomach in digesting food. (Id. ¶ 2.)

On October 15, 2012, Plaintiff took a leave of absence due to illness, which lasted until October 29, 2012.  (Defs.' SOF ¶ 34.)  Plaintiff was able to return to work without any problems after her first leave of absence.  (Id. ¶ 36.)  However, on November 5, 2012, Plaintiff took another leave of absence.  (Id. ¶ 37.)  She obtained a note from her medical provider dated November 9, 2012 which stated that Plaintiff would be out of work from November 8, 2012 through December 3, 2012 as a result of her medical condition.  (Id. ¶ 48; Pl.'s SOF ¶ 15.)  On or

about November 27, 2012, Plaintiff obtained a form which stated that her estimated date to return to work was extended to February 1, 2013 and indicated that Plaintiff would be required to undergo surgery for insertion of a gastric pacemaker. (Cert. of Matthew A. Green, Esq. (hereafter, "Green Cert."), Ex. 5 (Thomson Dep., Ex. RT-5).) The form did not identify the date of surgery, but the surgery was performed on January 3, 2013. (Green Cert., Ex. 1 at 113:21.)

In the meantime, by letter dated December 12, 2012, Plaintiff was advised that AutoZone would be replacing her position as Regional HR Manager. (Green Cert., Ex. 1 (Bertolotti Dep., Ex. P-10).) The letter further stated that when Plaintiff was able to return to work, AutoZone would "attempt to place [her] in an available position at that time." (Id.) Thomson testified that at the time the letter was written, it was his understanding that Plaintiff would be returning to work on February 1, 2013. (Green Cert., Ex. 5 at 58:19-24.)

Despite Plaintiff's anticipated return to work date of February 1, 2013, she did not return to work on that date. On or about February 5, 2013, Plaintiff obtained an AutoZoner Physician Report Non-Work Related Injury/Illness form. (Green Cert., Ex. 5 (Thomson Dep., Ex. RT-7).) The form indicates that Plaintiff was "[u]nable to return to work at [that] time" but

4

identified an anticipated return to work date of March 28, 2013. (<u>Id.</u>)  The form then listed certain restrictions to be in effect upon Plaintiff's return to work, which included as "permanent" restrictions "no exposure to theft detectors, power stations," and no "excessive or repetitive bending, twisting or stretching."  (<u>Id.</u>)  The form also set forth various other restrictions and indicates that such restrictions were to be in effect until March 28, 2013 "pending discharge from surgical center."  (<u>Id.</u>)  Finally, the form states that Plaintiff's next appointment with her general practitioner was scheduled for March 28, 2013, and that her appointment with her surgeon was scheduled for May 2013.

This AutoZoner form was provided to Defendant Thomson via e-mail.  (Green Cert., Ex. 5 at 59:13-60:5.)  On February 19, 2013, Plaintiff sent Thomson the following e-mail:

> I went back in for care so have not been able to talk to you.  I am hoping you recieved [sic] the paperwork for my RTW [return to work]. The permanent restrictions were put on there.  I will not be able to enter through any type of security stand devices which we have in the front of the store nor be around any battery charging type stations.  Please let me know if AZ will be able to accommodate such medical requests. I was also let know that my position was posted again today on CB and its [sic] on LinkedIN so I am also wondering what type of position would be available as you are filing [sic] my [position] that I had held.

(Green Cert., Ex. 1 (Bertolotti Dep., Ex. P-12).)  Thomson responded the following day asking Plaintiff to call him at his office.  (Id.)

Plaintiff and Thomson thereafter corresponded via telephone.  (Green Cert., Ex. 5 at 60:13-61:3.)  Thomson asked for clarification as to Plaintiff's restrictions, because he did not understand why she would be unable to pass through theft detectors.  (Id. at 63:15-64:13.)  Although Plaintiff told Thomson that her restriction meant that she could not pass through the theft detectors near the front doors, Thomson testified that he instructed Plaintiff to speak with her doctor to clarify the restriction.  (Id. at 64:9-13, 83:25-84:10.)  In particular, Thomson wanted to know whether the restriction applied to the theft prevention devices at the front of AutoZone stores, or to a device near the cash registers that deactivates security sensors on the merchandise.  (Id. at 63:18-64:2.)[2]

It does not appear that Plaintiff ever provided Thomson with the requested clarification.  (See Green Cert., Ex. 5 (Thomson Dep., Ex. RT-9).)  Plaintiff apparently was waiting on

---

[2] Plaintiff's testimony differs from Thomson's in this regard. Plaintiff testified that she told Thomson she "had the book on the pacemaker" which "clearly stated what [she] could be near and couldn't be near," and when he expressed disbelief she responded, "'I think the doctors and the company that makes the pacemaker probably know what I can be around.'"  (Green Cert., Ex. 1 at 154:3-13.)

information about the accommodation to be provided by AutoZone
before contacting her doctor.  In this regard, on March 21,
2013, Plaintiff wrote another e-mail to Thomson stating that she
"would like to once again request a job description for what
position you are offering me when I come back."  (Green Cert.,
Ex. 5 (Thomson Dep., Ex. RT-9).)  Plaintiff noted in the e-mail
that she could not "determine if she would be able to do the job
physically if [she does] not know what it is," nor could she
determine the accommodation she would need without knowledge of
the position to which she would return.  (Id.)  Further,
Plaintiff indicated that she had to go to the doctor as
requested by Thomson, but she would need to know what position
she would be returning to for the doctor to provide a return to
work date.  (Id.)

     In response to Plaintiff's e-mail, Thomson indicated that
he needed to engage in the interactive process so that he had a
clear understanding of Plaintiff's restrictions.  (Id.)   He
acknowledged receipt of the form setting forth Plaintiff's
restrictions, but he also indicated a need to "flush out the
nuances of those restrictions and how they will affect
[Plaintiff's] job duties."  (Id.)  Thomson then advised
Plaintiff that he would need a work release before engaging in
the interactive process.  (Id.)  Plaintiff wrote back to Thomson
arguing that the February 5, 2013 AutoZoner form was a release

7

for her return to work, noting that "[i]n order to review how [her] restrictions would effect a position we would need to know what that position is." (Id.)  Thomson, however, was unwilling to accept the February 5, 2013 AutoZoner form as a release, responding that Plaintiff would need a new AutoZoner report to be completed after Plaintiff was released to return to work, at which time he would meet with Plaintiff to discuss her restrictions and work toward an understanding of the accommodations being requested.  (Id.)  Plaintiff did not return to work on March 28, 2013.

On April 1, 2013, Plaintiff was again seen by her physician.  At that time, Plaintiff obtained another AutoZoner Physician Report.  (Green Cert., Ex. 1 (Bertolotti Dep., Ex. P-16).)  This report again listed Plaintiff's "permanent" restrictions and a number of other restrictions, and noted that the other restrictions were to be in effect until May 24, 2013.  (Id.)  The form did not indicate whether Plaintiff could return to work at that time.  (Id.)  However, the medical records from this visit indicate that paperwork was completed for continued leave from work.  (Green Cert., Ex. 1 (Bertolotti Dep., Ex. P-11).)  In addition, in response to a letter from the State of New Jersey, Department of Labor and Workforce Development dated April 24, 2013, Plaintiff indicated that she had not "returned

as of yet as [she was] still ill." (Green Cert., Ex. 1
(Bertolotti Dep., Ex. P-9).)

On April 11, 2013, Thomson again wrote to Plaintiff via e-
mail, advising that AutoZone had hired someone to replace
Plaintiff as the Regional HR Manager. (Green Cert., Ex. 5
(Thomson Dep., Ex. RT-11).) He once more stated in the e-mail
that when Plaintiff was released from her doctor to return to
work, he would then engage in the interactive process to
determine a position for her. (Id.) He also asked her to
contact her supervisor, Shawn Sheikhzadeh, to coordinate return
of her company car, computer and other assets. (Id.) Plaintiff
responded to the e-mail asking for Sheikhzadeh's phone number,
but did not at that time indicate that she was able to return to
work. (Id.)

Plaintiff was then seen by her primary care physician in
May 2013, and another AutoZoner report, dated May 24, 2013, was
prepared. (Green Cert., Ex. 1 (Bertolotti Dep., Ex. P-16).)
This report contains a number of restrictions, including the
same "permanent" restrictions identified on prior AutoZoner
reports, but then indicates that Plaintiff may return to work on
August 21, 2013 without any restrictions. (Id.) Defendants
dispute that they received either this AutoZoner report, or the
prior AutoZoner report dated April 5, 2013.

Defendants represent that by November 5, 2013, AutoZone had not received a return to work form for Plaintiff.  (Def.'s SOF ¶ 91.)  After being out of work for one year, Plaintiff's employment was administratively terminated in accordance with AutoZone policy.  (Id. ¶ 92.)

**III. <u>DISCUSSION</u>**

**A. Summary Judgment Standard**

Summary judgment is appropriate where the Court is satisfied that "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' . . . demonstrate the absence of a genuine issue of material fact" and that the moving party is entitled to a judgment as a matter of law.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (citing Fed. R. Civ. P. 56).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  <u>Id.</u>  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be

believed and all justifiable inferences are to be drawn in his favor.'" Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)(citing Anderson, 477 U.S. at 255, 106 S. Ct. 2505).

Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323, 106 S. Ct. 2548 ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."); see also Singletary v. Pa. Dept. of Corr., 266 F.3d 186, 192 n.2 (3d Cir. 2001) ("Although the initial burden is on the summary judgment movant to show the absence of a genuine issue of material fact, 'the burden on the moving party may be discharged by 'showing' -- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case' when the nonmoving party bears the ultimate burden of proof.")(citing Celotex, 477 U.S. at 325, 106 S. Ct. 2548).

Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Celotex, 477 U.S. at 324, 106 S. Ct. 2548. A "party opposing summary

judgment 'may not rest upon the mere allegations or denials of the . . . pleading[s.]'" <u>Saldana v. Kmart Corp.</u>, 260 F.3d 228, 232 (3d Cir. 2001).  For "the non-moving party[ ] to prevail, [that party] must 'make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial.'" <u>Cooper v. Sniezek</u>, 418 F. App'x 56, 58 (3d Cir. 2011) (citing <u>Celotex</u>, 477 U.S. at 322, 106 S. Ct. 2548).  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  <u>Anderson</u>, 477 U.S. at 257, 106 S. Ct. 2505.

###### B.  Analysis

###### 1.  Discrimination Claim

In Count I, Plaintiff asserts a claim for disability discrimination.  As the New Jersey Supreme Court has long recognized, "New Jersey has a strong interest in maintaining 'discrimination-free workplace[s]' for workers." <u>Cutler v. Dorn</u>, 196 N.J. 419, 429, 955 A.2d 917 (N.J. 2008) (citing <u>Lehmann v. Toys 'R' Us, Inc.</u>, 132 N.J. 587, 600, 626 A.2d 445 (N.J. 1993)).  The New Jersey Law Against Discrimination (hereafter, "NJLAD") provides, in relevant part, as follows:

> It shall be an unlawful employment practice, or, as
> the case may be, an unlawful discrimination . . .
> [f]or an employer, because of the . . . disability . .

. of any individual . . . to refuse to hire or employ
or to bar or to discharge . . . from employment such
individual[.]

N.J. Stat. Ann. § 10:5-12.

In considering Plaintiff's discrimination claim under the
NJLAD, the Court must determine which analytical framework
controls the claim.  "'This determination is predicated upon
whether the evidence of discrimination is 'direct' or
'indirect.''" Edwards v. Panther Tech., Inc., Civ. A. No. 10-
5214, 2012 WL 5880276, at *9 (D.N.J. Nov. 19, 2012) (quoting
Davis v. Atl. League of Prof'l Baseball Clubs, Inc., Civ. A. No.
07-5023, 2009 WL 1545844, at *3 (D.N.J. June 2, 2009)).

"When an employee attempts to prove discrimination by
direct evidence, the quality of evidence required to survive a
motion for summary judgment is that 'which if believed, proves
[the] existence of [a] fact in issue without inference or
presumption.'" Bergen Commercial Bank v. Sisler, 157 N.J. 188,
208, 723 A.2d 944 (N.J. 1999) (quoting Castle v. Sangamo Weston,
Inc., 837 F.2d 1550, 1558 n.13 (11th Cir. 1988)) (emphasis in
original).  "In the context of a claim for wrongful discharge,
an employee must show 'direct evidence that decisionmakers
placed substantial negative reliance on an illegitimate
criterion' . . . in deciding to terminate his or her
employment." Id. (quoting Fischer v. Allied Signal Corp., 974
F. Supp. 797, 804 (D.N.J. 1997)).  If the employee meets this

burden, "the burden then shifts to the employer to show it would

have made the same decision even in the absence of the

impermissible consideration."  Id. at 209, 723 A.2d 944; A.D.P.

v. ExxonMoil Research & Eng'g Co., 428 N.J. Super. 518, 524-25,

54 A.3d 813 (N.J. Super. Ct. App. Div. 2012) (where there was

direct evidence of discrimination based on disability, "the

burden of persuasion shifted to the employer, requiring it to

show that the employment actions taken would have occurred even

if it had not considered plaintiff's disability[.]").  This test

is the same as the test set forth in Justice O'Connor's

concurring opinion in Price Waterhouse v. Hopkins, 490 U.S. 228,

109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989).[3]

---

[3] In 2009, the United States Supreme Court declined to apply the
burden-shifting analysis of Price Waterhouse for Age
Discrimination in Employment Act ("ADEA") claims, and held that
a plaintiff must prove "by a preponderance of the evidence, that
age was the 'but-for' cause of the challenged adverse employment
action," such that the burden of persuasion "does not shift to
the employer to show that it would have taken the action
regardless of age, even when a plaintiff has produced some
evidence that age was one motivating factor in that decision."
Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 180, 129 S. Ct.
2343, 2352, 174 L. Ed. 2d 119 (2009).  However, the "but-for"
ADEA causation standard has not yet been adopted for direct
evidence NJLAD claims.  See Harth v. Daler-Rowney USA Ltd., No.
09-5332, 2012 WL 893095, *3 (D.N.J. March 15, 2012) (citing
Geltzer v. Virtua W. Jersey Health Sys., 804 F. Supp. 2d 241,
250 (D.N.J. 2011))(explaining that although the standard for
analyzing claims under the ADEA has changed from the burden
shifting analysis to a but-for causation requirement where there
are allegations of direct evidence, that standard has not yet
been applied to NJLAD claims); O'Brien v. Telcordia Tech., Inc.,
420 N.J. Super. 256, 20 A.3d 1154, 1163 (N.J. Super. Ct. App.
Div. 2011) (explaining that "we defer a decision on the thorny

By contrast, when the employee attempts to prove discrimination by circumstantial evidence, the court employs the burden-shifting analysis established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Gerety v. Atl. City Hilton Casino Resort, 184 N.J. 391, 399, 877 A.2d 1233 (N.J. 2005). To prove a prima facie case of disability discrimination, a plaintiff must demonstrate that she:

> (1)  is disabled or is perceived to have a disability;
> (2)  was qualified for the position;
> (3)  was subjected to an adverse employment action; and
> (4)  the employer sought to, or did fill the position with a similarly-qualified person.

Victor v. State, 203 N.J. 383, 409-10, 4 A.3d 126 (N.J. 2010); Gerety, 184 N.J. at 399, 877 A.2d 1233. Once the plaintiff satisfies her burden, the employer then must prove a legitimate, non-discriminatory reason for the employment action.  Gerety,

---

issue of the continued viability of the use of a Price Waterhouse mixed-motive analysis in light of the United States Supreme Court's decision in Gross v. FBL Financial Services, Inc., 557 U.S. 167, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009) in an age discrimination case instituted pursuant to the NJLAD"), certif. denied, 210 N.J. 479, 45 A.3d 984 (N.J. 2012). Here, Plaintiff has not brought an ADEA claim; she has only brought a claim under the NJLAD. Therefore, the Court will apply the New Jersey Supreme Court's decision in Sisler, which follows the Price Waterhouse analytical framework. See Harth, 2012 WL 893095, at *3 (finding that Gross does not apply where plaintiff only brought NJLAD claim).

184 N.J. at 399, 877 A.2d 1233.  The plaintiff can respond by showing that the reason proffered by the employer was merely pretext for the discrimination.  Id.

Defendants move for summary judgment in their favor on Plaintiff's disability discrimination claim, arguing that under the McDonnell Douglas burden-shifting framework, Plaintiff cannot establish a prima facie case of discrimination. Specifically, Defendants argue that Plaintiff was not qualified for her position in that she had not been released to return to work, and that her employment was terminated not because of her disability, but because she had not returned to work in one year.  In opposition, Plaintiff argues that the McDonell Douglas burden-shifting test does not apply to her case because instead of presenting circumstantial evidence to support her discrimination claim, she has presented direct evidence of discrimination, which applies the standard set forth in Price Waterhouse.  In reply, Defendants assert that Plaintiff's proffered direct evidence otherwise fails to demonstrate issues of material fact that require resolution by a jury.

Plaintiff's direct evidence of discrimination is the December 12, 2012 letter from Defendant Thomson.  (Green Cert., Ex. 1 (Bertolotti Dep., Ex. P-10).)  In the letter, Thomson indicates that Plaintiff had been on a leave of absence and was not eligible for Family Medical Leave Act job protection, and

16

then advised that AutoZone would be replacing Plaintiff's position as a Regional HR Manager.  Further, the letter states that when Plaintiff is able to return to work, AutoZone would attempt to place her in an available position at that time.  The Court concludes that this letter constitutes direct evidence of discrimination, as a reasonable jury could find that Defendants' decision to remove Plaintiff from her position as Regional HR Manager was motivated by Plaintiff's inability to return to work because of her medical condition.

In light of this direct evidence of discrimination, the burden of persuasion shifts to Defendants.  To prevail on summary judgment, Defendants must demonstrate that their actions were justified as a matter of law.  "[T]he NJLAD does not preclude employers from taking adverse employment actions against disabled individuals who are not able to perform the essential functions of their job."  White v. United Parcel Serv., Civ. A. No. 07-2464, 2008 WL 3895784, at *3 (D.N.J. Aug. 4, 2008).  In this regard, the NJLAD provides that an employer may discriminate on the basis of a disability where "the nature and extent of the handicap reasonably precludes the performance of the particular employment."  N.J. Stat. Ann. § 10:5-4.1. Moreover, the NJLAD should not be construed to "prevent the termination or change of the employment of any person who in the opinion of the employer, reasonably arrived at, is unable to

17

perform adequately the duties of employment[.]" N.J. Stat. Ann. § 10:5-2.1.  The implementing regulation of the NJLAD similarly provides that "[i]t shall be lawful to take any action otherwise prohibited under this section where it can be reasonably determined that an applicant or employee, as a result of the individual's disability, cannot perform the essential functions of the job even with reasonable accommodation." N.J. Admin. Code § 13:13-2.8(a).

Defendants contend that Plaintiff was not qualified to perform the essential functions of her job because she was never released to return to work.  The evidence of record demonstrates that Plaintiff's employment with AutoZone was ultimately terminated because Plaintiff's leave of absence extended for one year and Defendants did not know when Plaintiff would be returning to work.  Additionally, as Defendants point out, Plaintiff was not replaced in December 2012 because her replacement was not hired until April 2013, five months after Plaintiff's leave began.  However, the crucial question is not how long it actually took Plaintiff to recover, or how long it took Defendants to hire a new employee, but what Defendants knew and expected of Plaintiff's condition at the time they decided to remove her from the position of Regional HR Manager.

Thomson testified that a decision to find a replacement for Plaintiff was made only three to four weeks after Plaintiff was

out on leave, and the decision was made because of the uncertainty of Plaintiff's medical condition. (Green Cert., Ex. 5 at 35:7-21, 38:24-39:3.) Thomson also testified that at the time the decision to replace Plaintiff was made, it was his understanding that Plaintiff would be returning to work on February 1, 2013. (Id. at 58:19-24.) Therefore, at the time the decision was made, Defendants had reason to believe that Plaintiff might be cleared to return to work within a matter of weeks. A jury thus may conclude that Plaintiff was qualified to perform the essential functions of her position, with a reasonable accommodation in the form of a finite extension of medical leave. Although Plaintiff's recovery did not play out as anticipated, this is irrelevant to Defendants' decision to remove Plaintiff from her position in December 2012.[4]

In so finding, the Court recognizes that an employer is not required to grant a disabled employee an indefinite leave of absence if doing so would impose an undue hardship on the operation of the employer's business. See N.J. Admin. Code 13:13-2.5(b) ("An employer must make a reasonable accommodation

---

[4] To the extent Defendants focus on the termination of Plaintiff's employment with AutoZone in 2013, this argument is misplaced. As Plaintiff makes clear in her opposition brief, her disability discrimination claim is not based on the termination of her employment with AutoZone after one year of leave, but on the change in her employment -- i.e, the removal of Plaintiff from her position as Regional HR Manager -- because of her disability after only three to four weeks of leave.

to the limitations of [an] employee or applicant who is a person with a disability, unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of its business. . . . [E]xamples of reasonable accommodation may include . . . leaves of absence[.]"). Here, however, Plaintiff was not seeking an indefinite leave of absence at the time Defendants decided to remove her as Regional HR Manager. She had an anticipated return date of February 1, 2013. At that time, Defendants had no reason to believe that Plaintiff would not be returning on February 1, 2013 as planned. Thomson in fact testified that at the time the decision to remove Plaintiff as Regional HR Manager was made, he expected that Plaintiff would return on February 1, 2013.

Moreover, there is a dispute of fact as to whether granting Plaintiff a finite extension of medical leave would have imposed an undue hardship on AutoZone. At the time the decision was made to remove Plaintiff from her employment, she had only been out of work for three or four weeks. Despite Defendants' contentions that Plaintiff's position was "critical" and that the market to which she had been assigned was "challenging," these assertions are undermined by the fact that Plaintiff's replacement was not actually hired for five months.[5]   In the

---

[5] Moreover, the only evidence that Plaintiff's position was "critical" is Thomson's own characterization of the position as

interim, Plaintiff's duties were covered by other AutoZone
employees.  (Green Cert., Ex. 3 at 19:8-21.)  Because AutoZone
was able to operate without filling Plaintiff's position for
five months, a jury could find that it would not have been
unduly burdensome to grant Plaintiff, in December 2012, a short
extension of medical leave rather than remove her from the
position as Regional HR Manager.[6]

---

such (Green Cert., Ex. 5 at 34:23), as well as a statement by
Plaintiff's last supervisor, Shawn Sheikhzadeh, that the
Philadelphia market is "challenging" because there are a lot of
human resources issues.  (Green Cert., Ex. 3 at 20:11-14.)
Defendants do not present any objective evidence, such as the
types and numbers of issues that are handled by the Regional HR
Manager in the Philadelphia market, to support the subjective
assessments by Thomson and Sheikhzadeh.

[6] Defendants contend that they only sought Plaintiff's
replacement in the event that Plaintiff's leave was continued
again or in the event she could not return to work, noting they
did not actually hire her replacement for five months.  It is
not clear that Defendants would have returned Plaintiff to her
position as Regional HR Manager if she had come back to work at
some point before her replacement was hired.  In this regard,
while Defendants assert that they merely informed Plaintiff as a
"courtesy" in December 2012 that they would be replacing her if
she did not return as anticipated, the December 2012 letter
stated unequivocally that Plaintiff was being replaced as
Regional HR Manager, without any qualification that such
replacement would only occur if she was unable to return within
a specified time frame.  In addition, when Plaintiff wrote
Defendant Thomson in February 2013 inquiring as to what position
would be offered upon her return, Thomson did not reply that she
could return as Regional HR Manager, even though the position
had not yet been filled.  Under these circumstances, a jury
could find that Plaintiff had been removed from her position as
Regional HR Manager in December 2012 and would not have been
permitted to return to that position, even if she was able to
return to work before her replacement was hired.

Given the foregoing, the Court finds that Defendants fail to demonstrate that there are no undisputed facts concerning Plaintiff's disability discrimination claim, and Defendants thus are not entitled to judgment as a matter of law.  Plaintiff has presented sufficient facts to raise a dispute as to whether her disability was the motivating reason behind her removal from the position of Regional HR Manager.  The motion for summary judgment as to Count I will therefore be denied.

### 2.  Failure to Accommodate Claim

In Count II of the Complaint, Plaintiff asserts a claim for failure to accommodate under the NJLAD.  In order to prevail on a failure to accommodate claim under the NJLAD, a plaintiff must establish four elements:

> (1)  she was disabled and her employer knew it;
> (2)  she requested an accommodation or assistance;
> (3)  her employer did not make a good faith effort to assist; and
> (4)  she could have been reasonably accommodated.

Armstrong v. Burdette Tomlin Mem. Hosp., 438 F.3d 240, 246 (3d Cir. 2006) (citing Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 317-320 (3d Cir. 1999); Tynan v. Vicinage 13, 351 N.J. Super. 385, 400-01, 798 A.2d 648 (2002)).  When an employee requests an accommodation for a disability, the employer has a responsibility "to 'engage the employee in the interactive

process of finding accommodations.'"  Armstrong, 438 F.3d at 246 (quoting Taylor, 184 F.3d at 319).  "If an 'employee could have been reasonably accommodated but for the employer's lack of good faith,' the employee will win on his failure to accommodate claim."  Id. (quoting Taylor, 184 F.3d at 319-20).

The Court concludes that Defendants are not entitled to summary judgment on Plaintiff's failure to accommodate claim. Indeed, Defendants do not dispute that they failed to engage in the interactive process with Plaintiff.  The crux of Defendants' argument is that they were not required to engage in the interactive process because Plaintiff never provided a return to work form and therefore never demonstrated a "present" ability to perform the job.  In support of this argument, Defendants cite an exception purportedly contained at N.J. Admin. Code tit. 13, § 13-2.8(a), which they contend relieves an employer of its obligation to provide a reasonable accommodation when the employee, as a result of an individual disability, cannot "presently" perform the job even with the accommodation. According to Defendants, AutoZone did not make a determination on Plaintiff's requested accommodation because Plaintiff never demonstrated that she had been released to return to work.

The entire premise of Defendants' argument is flawed, however, because the New Jersey regulation upon which Defendants

rely has been amended to remove the "present" performance

language.   The regulation currently states as follows:

> It shall be lawful to take any action otherwise
> prohibited under this section where it can reasonably
> be determined that an applicant or employee, as a
> result of the individual's disability, cannot perform
> the essential functions of the job even with
> reasonable accommodation.

N.J. Admin. Code § 13:13-2.8.  This amendment, which removed the

word "presently," became effective as of January 3, 2006.  See

Santiago v. Cnty. of Passaic, No. A-3599-06T1, 2009 WL 483159,

at *6 (N.J. Super. Ct. App. Div. Feb. 27, 2009), certif. denied,

199 N.J. 516, 973 A.2d 384 (N.J. 2009).  As such, Defendants'

reliance upon the "present" performance exception, as well as

case law from 2005 which cites such exception, is unavailing.

The interactive process requires employers to make a good

faith effort to seek accommodations.  Taylor, 184 F.3d at 317.

"Employers can show their good faith in a number of ways, such

as taking steps like the following: meet with the employee who

requests an accommodation, request information about the

condition and what limitations the employee has, ask the

employee what he or she specifically wants, show some sign of

having considered [the] employee's request, and offer and

discuss available alternatives when the request is too

burdensome."  Id.

24

An employer does not have an obligation to initiate a conversation about possible accommodations until the employee makes "'clear that . . . assistance is desired for his or her disability.'" Brown v. Dunbar Armored, Inc., Civ. No. 08-3286, 2009 WL 4895237, at *3 (D.N.J. Dec. 10, 2009) (quoting Tynan, 798 A.2d at 647)). Any request that makes clear to the employer that the employee seeks an accommodation is sufficient to trigger the employer's obligation to engage in the interactive process. Id. There is no dispute in this case that Plaintiff requested an accommodation; her February 19, 2013 e-mail identified her permanent restrictions and specifically asked whether AutoZone "will be able to accommodate such medical requests." (Green Cert., Ex. 1 (Bertolotti Dep., Ex. P-12).)

Once Plaintiff requested an accommodation, Defendants were required to do more than tell Plaintiff that she could not return to work without a release. While Defendants argue that they needed to know a date certain for recovery and a medical release before engaging in the interactive process, at least one court in this district has rejected a similar argument. In Brown, the defendant argued that it had no obligation to consider any accommodations because no accommodation was possible without a medical release. 2009 WL 4895237, at *4. The district court noted that "because of the nature of the human body, it seems unlikely that a doctor will ever predict

the date of recovery with more certainty than identifying an
anticipated date or a general period of likely recovery." Id.
at *5.  The district court then stated that "[t]he law does not
require that the employer know that an accommodation is possible
before making reasonable efforts to identify an accommodation.
Instead, the law requires an interactive process, the purpose of
which is to search out accommodations that might suffice, not to
explore those obvious to the employer before the process even
occurs." Id.

     Further, the district court in Brown noted that "[t]he
purpose of the requirement of the interactive process is to spur
the kind of back-and-forth between the employer and the employee
necessary for them to mutually identify a reasonable
accommodation. . . . If [an employer] overlooks an accommodation
that it could have learned was viable by engaging in the
process, it is held accountable." Id. at *6.  The district
court then concluded that "[i]f it is the case that Plaintiff
requested some accommodation, then Defendant simply abdicated
its legal duties by mistakenly assuming that no accommodation
was possible without a medical release." Id.

     In this case, the Court finds a dispute of fact exists
concerning Defendants' good faith efforts to engage in the
interactive process.  Defendants did grant Plaintiff an
accommodation in the form of a leave of absence, but a leave of

absence was not the accommodation that Plaintiff requested, and there is no evidence that Defendants considered the accommodation that Plaintiff did request.  In fact, Thomson testified that no determination on Plaintiff's requested accommodation was ever made.  (Green Cert., Ex. 5 at 81:10-22.) Rather, Defendants insisted that Plaintiff provide a release to return to work before they would even engage in the interactive process, arguing that they would not know which positions were available that could accommodate Plaintiff's request until they knew a date certain of Plaintiff's return.  As noted in Brown, however, "[t]he law does not require that the employer know that an accommodation is possible before making reasonable efforts to identify an accommodation."  2009 WL 4895237, at *5. Plaintiff's lack of a definitive return to work date did not excuse Defendants of their obligation to engage in the interactive process under the NJLAD at the time Plaintiff requested an accommodation.

Even where an employer fails to engage in the interactive process to find an accommodation, a plaintiff must nonetheless identify a specific accommodation that could have been made. Although the plaintiff need not identify a specific accommodation at the time she requests assistance from her employer, in litigation she has the burden of proving that a reasonable accommodation existed.  Donahue v. Consol. Rail

27

Corp., 224 F.3d 226, 233-34 (3d Cir. 2000); Sinclair v. Domb
Lighting & Elec. Supply Co., No. A-4903-07T2, 2009 WL 1118813,
at *7-8 (N.J. Super. Ct. App. Div. Apr. 28, 2009).  As explained
in Sinclair, a plaintiff has "litigation tools available to him,
including discovery from the employer and the assistance of
counsel, to investigate facts and the law.  Through those tools,
the employee can and should determine what the employer could
have done to accommodate his specific needs."  Id. at *7.

Here, Plaintiff's position was not filled until April 2013
and therefore AutoZone could have returned Plaintiff to her
prior position as Regional HR Manager upon her expected return
to work date of March 28, 2013.[7]  In addition, the accommodation
requested by Plaintiff was that she need not enter AutoZone
stores through the front doors, where the theft detection
devices were located.  Thomson testified that there are other
doors in AutoZone stores -- namely, the fire exit doors and a
"rollup door" used when merchandise is delivered to a store --
where a person could enter without passing through a theft
detection device.  (Green Cert., Ex. 5 at 65:22-66:14.)

---

[7] Defendants repeatedly argue, citing the February 5, 2013
AutoZoner report, that Plaintiff's return to work date was
"pending discharge from surgical center."  In fact, the form
does not contain any qualifiers as to Plaintiff's anticipated
return to work date.  The qualification applies to the
restrictions identified on the form, not the anticipated return
to work date.  (Green Cert., Ex. 5 (Thomson Dep., Ex. RT-7).)

Therefore, Plaintiff has identified an accommodation that could have been made for her.

In so finding, the Court notes that there is a factual dispute as to whether Plaintiff was able to return to work on March 28, 2013.  The February 5, 2013 form only identified March 28, 2013 as an "anticipated" return to work date.  Plaintiff argues that she could not obtain a doctor's report conclusively establishing her return to work date until she knew which position she was being offered, because she needed to know the job duties of such position to determine whether she could perform the job in light of her restrictions.  Defendants argue that they could not identify a job position for Plaintiff until they knew her return to work date.  As a result, discussions came to a standstill, Plaintiff never returned to work on March 28, 2013, and a question of fact remains as to whether Plaintiff could have returned to work at that time.[8]  Viewing the facts in a light favorable to Plaintiff, the Court cannot conclude as a

---

[8] In this regard, while Plaintiff continued to remain on leave and obtain doctor's reports extending her anticipated return to work date, it is unclear whether she was unable to return to work in any capacity at AutoZone, whether she was unable to return as a Regional HR Manager because Defendants had not indicated a willingness to accommodate her restrictions, or whether she was unable to return to work because Defendants did not identify a new position for Plaintiff and a determination as to her ability to return to work could not be made.  Plaintiff testified that she felt she could return to work prior to March 28, 2013.

matter of law that Plaintiff could not have returned to work if she had been accommodated by allowing her to enter AutoZone stores through an entrance that did not contain a theft detection device.  The Court will thus deny Defendants' motion for summary judgment on Plaintiff's claim for failing to engage in the interactive process as required under the NJLAD.

### 3.    Retaliation Claim

Finally, Count III of the Complaint asserts a claim for retaliation.  Plaintiff alleges that she was forced to take unpaid medical leave, and her employment with AutoZone was ultimately terminated, because she requested a reasonable accommodation, which constitutes retaliation under the NJLAD.

The NJLAD makes it unlawful "[f]or any person to take reprisals against any person because that person has opposed any practices or acts forbidden under this act or because that person has filed a complaint, testified or assisted in any proceeding under this act."  N.J. Stat. Ann. § 10:5-12(d).  Retaliation claims under the NJLAD are analyzed under the McDonnell Douglas burden-shifting framework discussed above.  As noted supra, under McDonnell Douglas, a plaintiff must first establish a prima facie case before the burden shifts to the defendant to offer a legitimate, non-retaliatory reason for the employment action.  The burden then shifts back to the plaintiff

to demonstrate that the asserted non-retaliatory reason was merely pretextual.

To establish a prima facie case of retaliation, a plaintiff must demonstrate that (1) she engaged in protected activity -- here, a request for a reasonable accommodation; (2) she suffered an adverse action; and (3) a causal connection exists between the protected activity and the adverse action.  Royster v. New Jersey State Police, 439 N.J. Super. 554, 576, 110 A.3d 934 (N.J. Super. Ct. App. Div. 2015).  Defendants challenge the second and third prima facie elements, arguing that granting Plaintiff a leave of absence was not an adverse employment action because Plaintiff specifically requested such leave, and that Plaintiff cannot establish a causal connection because she requested, and was granted, leave before she made her request for an accommodation.  Moreover, to the extent the relevant adverse employment action was the termination of Plaintiff's employment in November 2013, Defendants assert that there is no causal connection because the adverse employment action occurred nine months after Plaintiff requested an accommodation.

Plaintiff responds that Defendants engaged in adverse employment actions in two ways: (1) the removal of Plaintiff from her position as Regional HR Manager in retaliation for her request for an extended medical leave; and (2) Defendants' refusal to allow Plaintiff to return to work despite her

repeated requests to do so, which eventually resulted in the termination of her employment.  The first adverse action, according to Plaintiff, was causally related to the protected activity because Plaintiff received the December 12, 2012 letter advising her that she would be replaced as Regional HR Manager just days after she requested that her medical leave be extended to February 1, 2013.  With respect to the second adverse action, Plaintiff does not specifically address the causal connection between Defendants' purported refusal to allow Plaintiff to return to work and her requested accommodation.

The Court finds that Plaintiff's retaliation claim survives summary judgment to the extent that it is based on the removal of Plaintiff from her position as Regional HR Manager in retaliation for Plaintiff's request for an extension of medical leave.  Plaintiff presents a prima facie case of retaliation: she engaged in protected activity when she submitted a request for an extension of medical leave on November 27, 2012; she was subjected to an adverse employment action when Defendants sent her a letter dated December 12, 2012 advising her that she was being removed from her position as Regional HR Manager; and a causal connection is established given the temporal proximity between the protected activity and the adverse employment action.  The "'close temporal proximity qualifies as unusually suggestive timing" and is evidence of a causal connection

between Plaintiff's request'" and the change in her employment.
Pizzo v. Lindenwold Bd. of Educ., Civ. A. No. 13-3633, 2015 WL
1471943, at *13 (D.N.J. Mar. 31, 2015) (citing Farrell v.
Planters Lifesavers Co., 206 F.3d 271, 285 (3d Cir. 2000)
(finding that time of three to four weeks between protected
activity and termination was "suggestive" of retaliation in
Title VII retaliation context); Bryson v. Regis Corp., 498 F.3d
561, 571 (6th Cir. 2007) (employee who was notified of her
termination three months after requesting FMLA leave and the day
she was scheduled to return to work established a causal
connection); LaFranco v. Avaya Inc., No. A-1666-06T2, 2009 WL
2850747, at *9 (N.J. Super. Ct. App. Div. 2009) (noting that
temporal proximity alone is sufficient to establish a causal
link under the NJLAD)).[9]

Under the McDonnell Douglas standard, the burden then
shifted to Defendants to assert a non-retaliatory reason for
their action.  Defendants contend that Plaintiff's position was
"critical" and that they needed to identify a new Regional HR

---

[9] While Defendants argue that there is no close temporal
proximity because Defendants did not actually hire Plaintiff's
replacement until five months after Plaintiff requested an
extension of leave, the December 12, 2012 letter -- sent only
fifteen days after Plaintiff requested leave -- unequivocally
advised Plaintiff that AutoZone would be replacing Plaintiff's
position.  As discussed above, there is no evidence that
Defendants would have returned Plaintiff to her position even if
she had returned to work on or prior to February 1, 2013.

Manager right away.  However, Plaintiff has presented evidence demonstrating that this asserted reason is pretext, because as discussed above, Defendants did not hire Plaintiff's replacement for five months.  In the interim, other AutoZone employees were able to cover Plaintiff's duties.  A jury could therefore reasonably conclude that at the time Defendants decided to replace Plaintiff's position, they could have had other employees cover her duties until her return, and that removing her from the position altogether was merely retaliation for seeking to extend her medical leave.

Plaintiff's alternative theory of retaliation also survives summary judgment.  Plaintiff contends that in retaliation for requesting time off, Defendants refused to allow her to return to work for twelve months, which ultimately resulted in the termination of her employment pursuant to AutoZone policy when her unpaid leave expired.  It appears that Plaintiff's theory is that she was retaliated against over the course of a year based upon a request for medical leave, although it is unclear whether her claim is based on her request for extended leave on November 27, 2012, or her subsequent request for extended leave in early February 2013.  The Court will address each request separately.

To the extent the retaliation claim is based on the November 27, 2012 request, there is no evidence of a causal connection between this request and the notion that Defendants

did not allow Plaintiff to return to work.  The November 27,
2012 form indicates that Plaintiff's estimated return to work
date was February 1, 2013.  Thereafter, Defendants sent
Plaintiff the December 12, 2012 letter advising that she was
being replaced as Regional HR Manager, but also stating that
AutoZone would attempt to find an available position for
Plaintiff when she was able to return to work and asking
Plaintiff to keep in contact with the benefits department
regarding her medical status.  Plaintiff did not return to work
on February 1, 2013, and although she testified that she felt
she could return to work on that date, the record is devoid of
an explanation for her failure to return.  In fact, in a
declaration provided by Thomson, he indicates that he did not
hear from Plaintiff on or before February 1, 2013 and attempted
to contact Plaintiff by telephone on February 4, 2013 to see how
she was doing.  There is simply no evidence in the record to
demonstrate that Defendants did not allow Plaintiff to return to
work in retaliation for her request in November 2012 for medical
leave.

      To the extent the retaliation claim is based on Plaintiff's
subsequent request for an extended medical leave in February
2013, there is a causal nexus between this request and
Defendants' refusal to allow Plaintiff to return to work.  On or
about February 7, 2013, Plaintiff submitted her request for

extended leave through March 28, 2013.  She was advised by e-
mail on March 22, 2013 that Defendants would not meet to
determine a position for her until she was released by her
doctor to return to work, thereby precluding Plaintiff's ability
to return to work on March 28, 2013.  Given the temporal
proximity between Plaintiff's request and Defendants' refusal to
meet with Plaintiff until she obtained a release to return to
work, the Court finds a causal link.  Plaintiff has thus met her
prima facie burden of demonstrating retaliation for requesting
an extended medical leave in February 2013.

Defendants have also met their burden of identifying a non-
retaliatory reason that Plaintiff was not permitted to return to
work on March 28, 2013.  According to Defendants, Plaintiff had
not presented a doctor's release to indicate that she was able
to return to work.  The Court agrees with Defendants that
requiring an employee to submit a doctor's release before
returning to work is a rational and legitimate requirement.
See, e.g., Revels v. Lucent Tech., Inc., 60 F. App'x 740, 745
(10th Cir. 2003) ("The goal of the release requirement -- to
ensure that returning to work does not hamper recovery -- is
rational and legitimate."); Rekstad v. First Bank Sys., Inc., 30
F. App'x 842, 847 (10th Cir. 2002) ("requiring a medical release
is not, on its face, a pretext for disability discrimination.").

36

The Court finds, however, that there are sufficient facts of record from which a juror could conclude that Defendants' insistence on a work release was pretextual.  As an initial matter, Plaintiff testified that after her first leave of absence in October 2012, she did not obtain a work release but AutoZone nonetheless allowed her to return to work.[10]  In addition, when Plaintiff's second leave of absence was set to expire on February 1, 2013, there is nothing in the record demonstrating that AutoZone requested a medical release for her return at that time.  Thomson's declaration merely indicates that when February 1, 2013 passed and he had not heard from Plaintiff, he reached out to her to see how she was doing, but there is no evidence that he ever asked for a doctor's release.  Furthermore, there is no evidence in the record that a work release was required as a matter of company policy or practice

---

[10] Plaintiff had submitted a doctor's note, dated October 22, 2012, excusing her from work from October 15, 2012 through October 29, 2012.  (Green Cert., Ex. 1 (Bertolotti Dep., Ex. P-11).)  Unlike the forms submitted in connection with her second leave of absence, which only contained "anticipated" dates that Plaintiff may return to work, the October 22nd note stated without qualification that Plaintiff may return to work on October 29, 2012.  While a jury may ultimately determine that the October 22, 2012 note was sufficient to release Plaintiff to return to work, whereas the notes submitted in connection with Plaintiff's second leave of absence were insufficient, the Court at this time cannot conclude that the October 22, 2012 note was sufficient to constitute a release, or that the AutoZoner form dated February 5, 2013 was not sufficient to release Plaintiff to return to work.

with respect to any other employees.  Viewing the facts most favorably to Plaintiff, the Court cannot conclude as a matter of law that Defendants' insistence on a doctor's release was not pretextual.  Accordingly, Defendants' motion for summary judgment as to Count III will be denied.

## V.    CONCLUSION

Although Defendants have presented evidence that Plaintiff was unable to return to work after twelve months of leave, which ultimately justified the termination of her employment in accordance with AutoZone policy, their post hoc rationalization does not excuse the decisions made at the time Plaintiff requested medical leave and accommodations based upon her disability.  Further, while there is no dispute that Plaintiff continued to extend her medical leave, it remains unclear whether she could not return to work at all, or whether a determination on her ability to return to work could not be made because Defendants never advised her of a position to which she could return.  Therefore, and for the reasons set forth above, Defendants' motion for summary judgment will be denied.

An Order consistent with this Opinion will be entered.

___s/ Noel L. Hillman _____
NOEL L. HILLMAN, U.S.D.J.

Dated: September 22, 2015

At Camden, New Jersey